IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT M. MCCLURE, JR.,      )
      )
Plaintiff,      )
      )
v.      )
      )    Case No. 4:12-cv-01763-RWS-SPM
      )
      )
CAROLYN W. COLVIN,[1]      )
Acting Commissioner of Social Security,      )
      )
Defendant.      )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the applications of Plaintiff Robert M. McClure, Jr. for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). This matter was referred to the undersigned United States Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C. § 636(b). The undersigned recommends that the decision of the Commissioner be affirmed.

## I.  PROCEDURAL HISTORY

On October 1, 2009, Plaintiff applied for DIB and SSI, alleging that he had been unable to work since October 1, 2008 due to mental impairments, including bipolar disorder, panic

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.

disorder with anxiety, severe depression, and attention deficit hyperactivity disorder (ADHD). (Tr. 123-27, 165). Those applications were initially denied. (Tr. 60-70). On February 2, 2010, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ). (Tr. 71-72). After a hearing on August 16, 2010, the ALJ issued an unfavorable decision. (Tr. 44-55). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeal's Council on April 26, 2011, but the Council declined to review the case on July 27, 2012. (Tr. 1-3, 117-19). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.  FACTUAL BACKGROUND

### A. BACKGROUND

At the hearing before the ALJ on August 16, 2010, Plaintiff testified as follows. Plaintiff was born on August 19, 1987, and he has a high school education. (Tr. 10-11, 14). At the time of the hearing, Plaintiff was working at a café, where he washed dishes and prepared food. (Tr. 10-11). Two years prior to the hearing, Plaintiff worked at the same café bussing tables; he quit that job due to his anxiety. (Tr. 11-12). Prior to his job bussing tables, Plaintiff washed dishes and made pizzas at a restaurant for three years; he was terminated from that job after having a conflict with his manager that resulted in a physical altercation. (Tr. 12-13, 25).

Plaintiff suffers from depression, anxiety, mood swings, and Attention Deficit Hyperactivity Disorder (ADHD). (Tr. 13-14). Plaintiff has between one and five anxiety attacks per day, with each lasting five to ten minutes. (Tr. 24). These attacks occur at work, and they cause him to freeze, have tunnel vision, shake, and stutter. (Tr. 22). In addition, Plaintiff sometimes becomes so anxious before work that he does not show up. (Tr. 12). Plaintiff is also "depressed all the time" and has been depressed as long as he can remember. (Tr. 13, 16).

Plaintiff also has mood swings at work. (Tr. 26). When supervisors instruct him to do things, he gets agitated and wants to yell or talk back. (Tr. 25-26). When supervisors criticize him, he gets agitated and confronts them. When supervisors yell for things, Plaintiff either gets angry or has an anxiety attack. (Tr. 26).

Plaintiff is nervous around people, while driving, while walking to work, and while at work. (Tr. 22). Plaintiff does not have his driver's license and testified that he failed his driving test three times because driving makes him nervous and paranoid and makes him shake and swerve. (Tr. 26).

Plaintiff was hospitalized the year prior to the hearing after a bad breakup with his girlfriend. Plaintiff currently receives treatment from Dr. Ilivicky, whom he sees once every three to four months. (Tr. 17). Plaintiff testified that he currently takes medication for his anxiety as well as his ADHD medication. (Tr. 19). He says "things have gotten better, but they're still not as good as I want them to be because I'm still having these issues." (Tr. 15).

Plaintiff's father also testified at the hearing before the ALJ. He testified that Plaintiff had had issues since he was five or six years old; that he was hyperactive; that he seemed to go downhill when he was in high school; that Plaintiff had a hard time after his after his breakup with his girlfriend (though Plaintiff's father was out of town during that time); that since Plaintiff's hospitalization following the breakup he has had no motivation; that Plaintiff's friends came over often and he liked to hang out with them; that he had not observed his son's panic attacks; that Plaintiff gets nervous about going to work; that Plaintiff sometimes behaves defiantly when asked to do things; and that medications calm Plaintiff down. (Tr. 28-36).

## B.  RECORDS OF TREATING SOURCES

Plaintiff received treatment from psychiatrist Howard Ilivicky, M.D., on numerous occasions from 2003 through 2010. (289-308).[2]  Records predating Plaintiff's alleged onset date of October 1, 2008 indicate that Dr. Ilivicky diagnosed Plaintiff with conditions including bipolar disorder, ADHD, oppositional defiant disorder, and panic disorder and prescribed medications including Adderall,[3] Zoloft,[4] Risperdal,[5] Celexa,[6] and Buspar.[7]  (Tr. 293-305).  A record from October 2006 noted that Plaintiff was "not good with people."  (Tr. 302).  A record from December 2007 noted that Plaintiff had panic attacks 3 times per day "out of the blue" lasting 10 to 15 minutes and accompanied by shortness of breath, chest tightness and shakes. (Tr. 303).

Plaintiff also saw Dr. Ilivicky on approximately seven occasions after Plaintiff's alleged disability onset date.  On March 20, 2009, Plaintiff reported to Dr. Ilivicky that he ran out of Adderall and two weeks later quit his job as a cook and dishwasher; he stated that he "felt job had no organization."  Dr. Ilivicky noted that Plaintiff had failed his drivers' test three times and that the tester had yelled at Plaintiff during the test.  Dr. Ilivicky also noted that Plaintiff had

---

[2] Many of Dr. Ilivicky's notes are illegible.  The undersigned has attempted to interpret them, with the assistance of the descriptions provided in the parties' briefs.

[3] Adderall is a brand name for a combination of dextroamphetamine and amphetamine; it is used to treat ADHD.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html.

[4] Zoloft is a brand name for sertraline; it is used to treat depression, panic attacks, and social anxiety disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html.

[5] Risperdal is a brand name for risperidone; it is used to treat schizophrenia, certain symptoms of bipolar disorder, and certain behavior problems.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html.

[6] Celexa is a brand name for citalopram; it is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

[7] Buspar is a brand name for buspirone; it is used to treat anxiety disorders.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html.

intermittent anxiety and a constricted affect. Dr. Ilivicky noted diagnoses of ADHD and anxiety disorder and prescribed Adderall and Celexa. (Tr. 305).

On June 4, 2009, Dr. Ilivicky again noted diagnoses of ADHD and anxiety disorder and prescribed Adderall and Celexa. (Tr. 270).

On September 18, 2009, Plaintiff went to Center Pointe Hospital ("CPH") complaining of depression and anxiety triggered by a break up with his girlfriend and by his best friend's refusal to talk to him. (Tr. 251). A mental status examination of Plaintiff showed motor retardation, problems sleeping, poor appetite, decreased concentration, feelings of helplessness/hopelessness, a depressed mood, a flat affect, and poor insight. (Tr. 253-54). It was noted that Plaintiff was not medication compliant. (Tr. 254). Plaintiff was diagnosed with depressive disorder. (Tr. 258).

A day later, Plaintiff returned to CPH, reporting suicidal thoughts, anxiety, agitation, and sleeplessness. (Tr. 245-46). His affect was depressed, his thought content was positive for depressive symptoms, and his insight and judgment were fair. (Tr. 246). He was assigned a Global Assessment of Functioning ("GAF") score of 40[8] and was admitted for crisis

---

[8] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* 32.

intervention. (Tr. 240, 245-46). Plaintiff reported that he took Adderall twice daily but that he had not taken his antidepressant medications for months. (Tr. 247, 249).

Plaintiff was discharged after five days. (Tr. 240). At discharge, he was noted to be "calm, cooperative, fully oriented, non-suicidal and non-homicidal"; he was diagnosed with adjustment disorder with disturbance of emotional conduct and ADHD; and he was assigned a GAF of 45.[9] (Tr. 240-41). Plaintiff was discharged for outpatient counseling through Catholic Family Services and for outpatient follow-up with Dr. Ilivicky. (Tr. 240).

On October 14, 2009, Plaintiff saw Dr. Ilivicky for follow-up. He reported experiencing issues with his ex-girlfriend. Dr. Ilivicky noted that Plaintiff had a restricted affect, diagnosed Plaintiff with anxiety disorder and ADHD, prescribed Adderall and Ativan,[10] and referred Plaintiff for counseling. (Tr. 271).

On January 19, 2010, Plaintiff returned to Dr. Ilivicky and reported that he was still getting anxious. However, he also reported that he was meeting new friends at work and hanging out with them. Plaintiff reported that he went to California two weeks prior to visit a friend and that he was nervous on the plane. Dr. Ilivicky again noted diagnoses of anxiety disorder and ADHD and again prescribed Adderall and Ativan. Dr. Ilivicky also noted that Plaintiff had a history of doing worse on antidepressant medications and indicated that he would consider prescribing Abilify[11] in the future. (Tr. 289).

---

[9] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

[10] Ativan is a brand name for Lorazepam; it is used to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html.

[11] Abilify is a brand name for aripiprazole; it is used to treat symptoms of schizophrenia, certain symptoms of bipolar disorder, and depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html.

On April 20, 2010, Plaintiff returned to Dr. Ilivicky and reported that he was concerned about a "lot of stuff," including issues related to his parents' decision to divorce. It was noted that Plaintiff was fixing old X-Boxes and that his father was trying to get him a job at a grocery store. Dr. Ilivicky stated, "watch for anger." He again noted diagnoses of anxiety disorder and ADHD. (Tr. 292).

On July 19, 2010, Dr. Ilivicky noted chronic anxiety and anxiety attacks, diagnosed anxiety and ADHD, and prescribed Adderall, Ativan, and Remeron.[12] (Tr. 307-08).

On August 31, 2010, Plaintiff returned to Dr. Ilivicky and reported feeling "stressed out." Dr. Ilivicky diagnosed anxiety and ADHD and prescribed Adderall, Abilify, Klonopin,[13] and Celexa. (Tr. 308).

In addition to the above visits, records indicate that Plaintiff's Adderall prescription was refilled at various times in between his visits to Dr. Ilivicky. (Tr. 289, 291, 307).

## C. OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

### 1. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RFC ASSESSMENT BY MARSHA TOLL, PSY.D. (NOVEMBER 30, 2009)

On November 30, 2009, Marsha Toll, Psy.D., completed a Psychiatric Review Technique Form for Plaintiff. (Tr. 274-84). Dr. Toll found that Plaintiff had medically determinable impairments of ADHD, Anxiety, and Adjustment Disorder. (Tr. 275, 278). She noted Plaintiff had experienced one episode of recurrent obsessions or compulsions which are sources of marked distress. (Tr. 278). She found Plaintiff had no restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration,

---

[12] Remeron is a brand name for mirtazapine; it is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html.

[13] Klonopin is a brand name for clonazepam; it is used to treat panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html.

persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 282). Dr. Toll reviewed Plaintiff's medical history and concluded that Plaintiff was limited in his ability to handle stress and the demands of the public. (Tr. 284).

On that same day, Dr. Toll completed a Mental RFC Assessment. (Tr. 285-87). She opined that Plaintiff's ability to maintain attention and concentration for extended periods and his ability to interact appropriately with the general public were moderately limited. (Tr. 285-86). Dr. Toll found no significant limitations in any other area assessed. (Tr. 285-87).

### 2. MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (MENTAL) BY SHEA VOELKER, PSY.D. (OCTOBER 9, 2010)

On October 9, 2010, at the request of the ALJ, Shea Voelker, Psy.D., examined Plaintiff and completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (Tr. 310-15). Dr. Voelker found that Plaintiff had a depressed mood with a congruent effect. However, Plaintiff had no difficulties relating to the examiner, engaged in some spontaneous conversation, had adequate eye contact, was cooperative with the examiner, and had a logical and sequential thought process. Dr. Voelker administered the Minnesota Multiphasic Personality Inventory (MMPI-2) personality test. Dr. Voelker noted that Plaintiff's scores seemed more severe than Plaintiff's actual functioning and that certain elevated test scores were consistent with a "cry for help." (Tr. 312-14). Plaintiff's scores indicated that he is extremely self-critical, cynical, skeptical, and dissatisfied, with low insight and poor self-concept; is highly suspicious of others; is brooding, resentful, and angry; feels that he is mistreated; typically misinterprets the motives of others; feels that he did not receive a fair deal in life; has rigid thinking; is argumentative; exhibits a high level of worry; is tense; has difficulty concentrating; is self-conscious; feels a generalized sense of guilt; overacts and exaggerates the importance of events; feels discomfort in group interactions; may have poor social skills; lacks self-confidence; and

may be shy, insecure, withdrawn, and ruminative. (Tr. 314). Dr. Voelker diagnosed major depressive disorder, panic disorder, generalized anxiety disorder, and avoidant personality disorder, and she assigned a GAF of 55.[14] Dr. Voelker stated that Plaintiff's prognosis was fair with continued psychiatric treatment and regular therapy visits. (Tr. 315).

In her Medical Source Statement form, Dr. Voelker opined that Plaintiff had marked limitations in the ability to make judgments on complex work-related decisions, to carry out complex instructions, and to interact appropriately with supervisors. She indicated that Plaintiff had moderate limitations in the ability to understand and remember complex instructions, interact appropriately with the public, and interact appropriately with co-workers; and mild or no limitations in the other areas assessed. Dr. Voelker noted that in making these findings she had considered "[Plaintiff's] difficulty in the work setting when the job became stressful with many people around him," "his reported work incident with a physical altercation," and his "diagnosis of avoidant personality disorder." (Tr. 316-17). She estimated that Plaintiff's limitations were first present approximately one year prior. (Tr. 317).

### D.  VOCATIONAL EVIDENCE

Vocational Expert (VE) James Israel testified before the ALJ. (Tr. 36-40). The VE testified that he had been present during the prior hearing testimony. (Tr. 36). The ALJ asked the VE the following question:

> Now,— if I were to find that with medication or therapy or both that Mr. McClure was able to control the anxiety and the depression to the point where he could focus on one, two-step instructions in a low-stress environment without a lot of social interaction. What types of jobs would you place somebody on that had a problem with depression and anxiety, assuming no really significant—the ability to do sedentary, light, even medium type of work.

---

[14] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

(Tr. 38-39). The VE testified that such a person could be placed in certain lower-stress and lower-interaction dishwasher jobs (of which there are 2,200); in certain lower-stress and lower-interaction packing and wrapping jobs (of which there are 4,500), in certain lower-stress and lower-interaction assembly and production jobs (of which there are 2,800), and in certain lower-stress and lower-interaction cleaning jobs (Tr. 39-40). The VE testified that if Plaintiff had mood swings, were late to or absent from work, had interpersonal issues with coworkers, and had problems interfering with his concentration on the job, he would not be able to sustain any jobs. (Tr. 40).

### III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy,* 648 F.3d at 611 (discussing the five-step process). At Step One, the ALJ determines whether the

claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

On February 22, 2011, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 47-55).  He found that Plaintiff had not engaged in substantial gainful activity since October 1, 2008, the alleged onset date.  He found that Plaintiff had severe impairments of major depressive disorder and generalized anxiety disorder.  He found that Plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing.  (Tr. 49).  After consideration of the record, the ALJ found that Plaintiff had an RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is restricted to simple, low stress jobs that do not involve close interaction with supervisors, co-workers, and the public.  (Tr. 50).  The ALJ determined that Plaintiff could perform his past relevant work as a dishwasher.  (Tr. 54).  Thus, the ALJ concluded Plaintiff had not been under a disability, as defined in the Act, from October 1, 2008, through the date of his decision.  (Tr. 54-55).

## V.    DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence 'is less than

preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore,* 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. THE ALJ'S DETERMINATION OF PLAINTIFF'S RFC

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence, because the ALJ failed to sufficiently account for Plaintiff's mental impairments. A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

Plaintiff first argues that the ALJ's RFC assessment did not sufficiently account for the finding of consultative examiner Dr. Voelker's finding that Plaintiff has "marked" limitations in

the ability to interact with supervisors.  The undersigned disagrees.  First, the ALJ did impose very significant limitations on Plaintiff's ability to interact with supervisors, limiting Plaintiff to low stress jobs that "do not involve close interaction with supervisors, co-workers, and the public."  (Tr. 50).  Second, although the ALJ discussed Dr. Voelker's findings in detail and gave them "great weight," (Tr. 52), he was not required to completely adopt every opinion offered by Dr. Voelker.  Instead, he properly conducted a review of all of the relevant evidence, including Plaintiff's medical records, physicians' observations, expert opinions, Plaintiff's own description of his limitations, and the relevant credibility factors (discussed below), before determining that Plaintiff was capable of some interaction with supervisors.  *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.").

The ALJ's finding regarding Plaintiff's ability to interact with supervisors was supported by substantial evidence in the record.  As the ALJ pointed out, Plaintiff's GAF score of 55 is consistent with moderate symptoms or moderate difficulty in social or occupational functioning, suggesting that he was capable of limited interactions with supervisors and others.  (Tr. 53).  Moreover, Dr. Voelker's examination findings indicated that Plaintiff had no difficulty relating to the examiner, could participate in spontaneous conversation with adequate eye contact, and had a cooperative attitude.  (Tr. 52-53, 312-14).  She also indicated that he had only "moderate" limitations in the ability to interact with co-workers and the general public.  (Tr. 317).  The ALJ also noted that his finding was supported by the opinion of non-examining psychologist Dr. Toll that Plaintiff had only moderate difficulties in maintaining social functioning and moderate limitations in his ability to interact appropriately with the general public.  (Tr. 54, 282, 286).

The ALJ also properly noted that many of Plaintiff's activities appeared inconsistent with a disabling mental impairment, including the fact that at the time of the hearing he was able to work at a café bussing tables and preparing food, the fact that in August 2010 Plaintiff reported to his treating psychiatrist that he was working 40-50 hours per week, and the fact that Plaintiff was meeting new friends and traveling out of state to visit old friends. (Tr. 52, 289).

Finally, the ALJ properly considered evidence suggesting that Plaintiff's depression and anxiety were in part situational: although Plaintiff was hospitalized in September 2009 due to suicidal thoughts (and had GAF scores of 40 and 45 during that time), records indicated that Plaintiff had been off his anti-depressant medication and had been doing well until a four-year relationship with his girlfriend ended. (Tr. 51-52, 245). In addition, by the time of his discharge, he was not suicidal and was calm and cooperative. (Tr. 240-41). Such situational depression is not disabling. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (affirming the ALJ's finding that the claimant's depression was not severe where the record suggested his depression was situational, was related to marital issues, and improved with a regimen of medication and counseling).

Plaintiff also suggests that the ALJ erred by relying on various normal mental status examination findings that were not directly relevant to Plaintiff's ability to interact with supervisors, such as findings that Plaintiff was non-suicidal, had intact memory, had no gait or motor abnormalities, and was calm and oriented. The ALJ mentioned such findings as part of his detailed review of the record, along with other mental status examination findings, opinion evidence, medical records, and testimony. (Tr. 51-54). Nothing in the ALJ's opinion suggests that he relied primarily or exclusively on irrelevant mental status examination findings to reach his conclusions regarding Plaintiff's ability to interact with supervisors or others.

Plaintiff also suggests that the ALJ erred by noting that the record did not reflect aggressive and frequent treatment without explaining how additional treatment would have restored Plaintiff's ability to work, and without exploring the reasons why Plaintiff did not follow a prescribed course of treatment. In support of this argument, Plaintiff cites 20 C.F.R. § 404.1530 and Social Security Ruling 82-59. Plaintiff's argument is misplaced. The cited authorities address what the ALJ must do before finding that an individual who would otherwise be found disabled is found not disabled due to a failure to follow treatment recommendations. *Id.*; *see also Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (stating, "Social Security Ruling 82-59 only applies to claimants who would otherwise be disabled within the meaning of the Act."). Here, the ALJ did not find that Plaintiff would have been disabled but was not disabled because he had failed to follow treatment recommendations; rather, he mentioned the lack of medical records documenting Plaintiff's treatment records during his review of the medical records and found that the lack of treatment records undermined Plaintiff's credibility regarding the severity of his impairments. (Tr. 53).

Plaintiff also cites *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009), apparently suggesting that it was improper for the ALJ to consider the frequency of his mental health treatment without considering whether Plaintiff's mental impairments contributed to his failure to seek more frequent treatment. However, here, unlike *Pate-Fires*, the record does not suggest that Plaintiff's mental impairments affected his ability to seek treatment, nor does Plaintiff make such an argument. *See Wildman v. Astrue*, 596 F.3d 959, 966-69 (8th Cir. 2010) (distinguishing *Pate-Fires* where there was little or no evidence expressly linking the claimant's mental limitations to her noncompliance); *Miller v. Astrue*, No. 1:12CV15 JCH/FRB, 2013 WL 1112397, at *12 (E.D. Mo. Feb. 28, 2013) ("Here, unlike in *Pate-Fires*, there is no evidence

linking mental illness to plaintiff's failure to consistently seek mental health care. . . . [T]he undersigned finds that the ALJ properly considered plaintiff's failure to seek regular mental health treatment as one factor detracting from his credibility."), *Report and Recommendation adopted by* 2013 WL 1103904 (March 18, 2013). Moreover, assuming *arguendo* that the ALJ erred by considering Plaintiff's failure to seek more frequent treatment mental health as a credibility factor without addressing whether that failure was a result of his mental illness, any such error was harmless because of the other substantial evidence supporting the ALJ's RFC assessment and the other substantial evidence supporting the ALJ's credibility analysis (discussed below).

Finally, Plaintiff points to evidence in the record that might support a more restrictive RFC, including his own testimony regarding his anxiety and mood swings; notes indicating that he had lost a prior job after a physical altercation with a manager; Dr. Voelker's statement that his test scores indicated that he was "highly suspicious of others" and "typically misinterprets the motives of others"; notes from his treating physician's records noting that Plaintiff was "not good with people" and had panic attacks, anger, and chronic anxiety; and records of a 2009 hospitalization for suicidal thoughts and depression. (Tr. 240, 245-49, 302, 314). However, the court "'do[es] not reweigh the evidence presented to the ALJ.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)). After review of the record as a whole, including the evidence cited by Plaintiff and that relied on by the ALJ, the undersigned finds that the ALJ's

decision was supported by substantial evidence and fell within the available "zone of choice." *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact.").

### C. THE ALJ'S EVALUATION OF PLAINTIFF'S CREDIBILITY AND PLAINTIFF'S FATHER'S CREDIBILITY

Plaintiff also argues that the ALJ failed to conduct an adequate analysis of the credibility of his allegations and of his father's testimony. Specifically, Plaintiff claims that the ALJ did not adequately address his testimony that he lost a job after a conflict with his manager, that he quit another job due to anxiety around others, that during mood swings he feels himself wanting to yell at people, and that his current manager told him that he cannot work on Saturdays because it is too busy and it makes Plaintiff nervous. He also notes that the ALJ never made a credibility determination regarding his father's testimony.

When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'" *Moore*, 572 F.3d at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. *Id.* (citing *Goff*

*v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).  The court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'"  *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

Here, the ALJ discussed in detail Plaintiff's testimony regarding his complaints and then properly considered several of the relevant factors in determining that Plaintiff's allegations were not fully credible.  (Tr. 51-54).  The ALJ properly considered Plaintiff's daily activities, finding the facts that Plaintiff was meeting and hanging out with friends, traveling out of state to visit an old friend, applying for jobs, and working up to 40-50 hours a week to be "grossly inconsistent" with allegations of disabling impairments.  (Tr. 54).  *See Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) ("'We have held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'"  (quoting *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)).  The ALJ conducted an extensive review of the medical records and properly noted that they do not document any long-term, significant limitations on Plaintiff's functional capacity.  *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (noting that the fact that no doctor had placed limitations on Plaintiff was a proper consideration in the ALJ's credibility analysis); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [the claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work.").  The ALJ also discussed several medical findings he found inconsistent with Plaintiff's claims of disabling mental conditions, including several normal mental status examination findings, Dr. Voelker's observation that Plaintiff had no difficulty relating to the examiner, and Dr. Voelker's assessment of a GAF score of 55, indicating moderate symptoms.  (Tr. 52-53).  Because the ALJ expressly discounted Plaintiff's

credibility and articulated good reasons for doing so, the undersigned defers to the ALJ's credibility assessment. *See Buckner*, 646 F.3d at 558.

Plaintiff also argues that the ALJ erred by failing to sufficiently summarize, address, consider or make any credibility determinations regarding the testimony of Plaintiff's father. The ALJ is required to "carefully consider any other information [the claimant] may submit about [his or her] symptoms," including statements "other persons provide about [the claimant's] pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). However, the Eighth Circuit "has not always insisted that the ALJ explicitly explain its reasons for discrediting a third-party's statements about the claimant's condition." *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011) (holding that the ALJ's failure to expressly address plaintiff's girlfriend's statement in his decision did not require remand; reasoning that the same evidence the ALJ referred to in discrediting the plaintiff's claims also discredited his girlfriend's claims).

Here, Plaintiff's father's testimony offered little relevant information regarding Plaintiff's symptoms. He had not observed his son's panic attacks and was not in town when his son was hospitalized after the problems with his girlfriend. (Tr. 28, 30, 33). His testimony that Plaintiff gets nervous about going to work, sometimes behaves defiantly when asked to do things, and has no motivation is largely duplicative of Plaintiff's own testimony; thus, as in *Buckner*, the same evidence the ALJ found discredited Plaintiff (such as ability to work 40 hours a week and the lack of any long-term functional restrictions from Plaintiff's physicians) would also discredit that testimony from Plaintiff's father. *See* 646 F.3d at 560. Moreover, it does not appear that Plaintiff's father's testimony is necessarily inconsistent with the ALJ's RFC finding, in which the ALJ limited Plaintiff to low-stress jobs that "do not involve close interaction with supervisors, co-workers, and the public." (Tr. 50). Therefore, the ALJ's failure to address

Plaintiff's father's testimony had no bearing on the outcome of the case and does not require remand. *See id.; see also Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992). (holding that although it is preferable for the ALJ to delineate the specific credibility determinations for each witness, the failure to do so does not require reversal where it has no bearing on the outcome of the case).

### D. THE ALJ'S HYPOTHETICAL QUESTION TO THE VE

Plaintiff's final argument is that the ALJ erred by relying on vocational expert testimony to determine that he could perform past work, because the ALJ's hypothetical question to the VE did not include any reference to Plaintiff's age or education. This argument has no merit.

At step *five* of the five-step analysis, the ALJ must "look at [the claimant's] ability to adjust to other work by considering [the claimant's] residual functional capacity and the vocational factors of age, education, and work experience." 20 C.F.R. §§ 404.1560(c), 416.960(c). Here, however, the ALJ found at step *four* that Plaintiff could return to his past relevant work. (Tr. 54). At that step, the ALJ need not consider Plaintiff's age or education level. *See* 20 C.F.R. §§ 404.1560(b)(3), 416.960(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. *We will not consider your vocational factors of age, education, and work experience* . . . ." (emphasis added)).

Moreover, even if the ALJ were required to consider Plaintiff's age and education level at step four, his failure to include specific references to Plaintiff's age or education in the hypothetical would not be reversible error. First, it is apparent from the record that the VE's testimony was informed by an existing knowledge of Plaintiff's age and education level. The VE was present at the hearing where Plaintiff testified regarding his age and education level, and

he had reviewed Plaintiff's case prior to testifying.  (Tr. 10-12, 36).  In addition, the ALJ stated in his hypothetical to the VE, "Now – if I were to find that with medication or therapy or both that *Mr. McClure* was able to control the anxiety . . . What types of jobs would you place somebody on with those problems?"  (Tr. 39) (emphasis added).  The ALJ's reference to "Mr. McClure" makes it clear that he was referring to Plaintiff, whose age and education level were not in dispute.

Second, Plaintiff offers no reason why either Plaintiff's age or education would affect his ability to perform his past relevant work as a dishwasher.  At the time of the hearing, Plaintiff was 23 years old and had a high school education.  With regard to age, the relevant regulations specify that "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work."  20 C.F.R. §§ 404.1563(c), 416.963(c).  With regard to education, the relevant regulations state that someone with a high school education is considered capable of semi-skilled and skilled work.  20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).  Neither the ALJ nor the VE described the skill level of Plaintiff's prior work; however, the *Dictionary of Occupational Titles* (*DOT*) entry that appears to describe dishwashing is "Kitchen Helper," *DOT* No. 318.687-010.  That job has an SVP level of 2, indicating that it is unskilled work.[15]  Thus, any error in failing to mention Plaintiff's age and education in the hypothetical question was harmless.  *See Brueggeman v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (applying harmless error analysis and noting that the standard is "whether the ALJ would have reached the same decision denying benefits" even absent the

---

[15] "The DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 C.F.R. sections 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Social Security Ruling 00-4p (Dec. 4, 2000).

error); *Schneiders v. Barnhart*, No. C05-4092-MWB, 2006 WL 559247, at *13 (N.D. Iowa March 27, 2006) (holding that a VE's failure to include an impairment in a hypothetical to VE was harmless where the jobs identified by the VE were not inconsistent with those impairments).

## VI.    CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of February, 2014.